USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 9/23/2022

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

LOURDES MATIAS,                              :
                                             :
                              Plaintiff,     :
                                             :          20-CV-2849 (VEC)
             -against-                       :
                                             :          OPINION
MONTEFIORE MEDICAL CENTER and                :
JENNETTE WOHLAR,[1]                          :
                                             :
                              Defendants.    :

-------------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

        Plaintiff Lourdes Matias has sued Montefiore Medical Center ("Montefiore") and

Jennette Wohlars (collectively, "Defendants") for various types of discrimination and

retaliation.[2]  See Compl., Dkt. 1.  Defendants have moved for summary judgment on all of

Plaintiff's claims.  See Defs. Mem. of Law, Dkt. 35.  For the reasons discussed below,

Defendants' motion for summary judgment is GRANTED.

---

[1]      Defendant Jennette Wohlars's surname is spelled incorrectly in the case caption as "Wohlar."  Decl. of
Jennette Wohlars, Dkt. 36 ¶ 1 n.1.  All references to this Defendant herein are made to "Wohlars."

[2]      Specifically, Plaintiff alleges violations of the Age Discrimination in Employment Act ("ADEA"), 29
U.S.C. § 621; Older Workers Benefit Protection Act ("OWBPA"), id.; Title VII of the Civil Rights Act of 1964, 42
U.S.C. 2000; Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12122; Family and Medical Leave Act of 1993
("FMLA"), 29 U.S.C. § 2601; the Executive Law of the State of New York, New York State Human Rights Law
("Executive Law") § 296; and the Administrative Code of the City of New York, New York City Human Rights
Law ("Administrative Code"), § 8-101.

## BACKGROUND[3]

Plaintiff is a 55-year-old Catholic who began working as a registered nurse for Montefiore Hospital on June 22, 2015.  Pl. 56.1 ¶¶ 6, 9.  Plaintiff worked in the Cardiac Catheterization Lab (the "Cath Lab") where she provided care to patients undergoing cardiac catheterization procedures.  *Id.* ¶ 9.  Plaintiff reported directly to Defendant Jennette Wohlars, the Administrative Nurse Manager of the Cath Lab.  *Id.* ¶¶ 12, 14.  As a nurse in the Cath Lab, Plaintiff was required to wear a heavy lead apron and to "be able to lift and move objects up to 100 pounds, bend, lift, reach and stand for long periods of time and respond quickly to a variety of changing conditions."  Declaration of Jennette Wohlars, Dkt. 36 ¶ 13 (hereinafter, "Wohlars Decl."); *id.* Ex. D, Dkt. 36-4; *see also* Pl. 56.1 ¶ 18.

Plaintiff suffers from acute osteoarthritis with bone-to-bone contact, which required a complete knee replacement.  Pl. Opp. at 1, Dkt. 39.  Plaintiff also has adhesive capsulitis in her left shoulder.  Pl. 56.1 ¶ 35.  Around the end of 2016, Plaintiff began experiencing severe pain in her knee, which she believes was aggravated by the constant heavy lifting required by her job. Pl. Opp. at 2; Pl. 56.1 ¶ 73.  Plaintiff requested lighter duty work as an accommodation of her disability, which was denied.  Pl. Opp. at 2; Pl. 56.1 ¶ 17.[4]

---

[3]     The facts are gathered from the parties' 56.1 statements, the exhibits attached to the parties' submissions, and the parties' summary judgment briefs.  The facts are construed in the light most favorable to the non-moving party.  *See Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 30 (2d Cir. 2018).  All facts are undisputed unless otherwise indicated.  Defendants' 56.1 Statement, Dkt. 34, is cited as "Defs. 56.1"; Plaintiff's 56.1 Counter Statement, Dkt. 40, is cited as "Pl. 56.1".

[4]     It is undisputed that Defendants, nevertheless, attempted to accommodate Plaintiff's request by assigning her to work in the ambulatory care area on certain days.  *See* Defs. Mem. of Law at 14 n.13 (citing Defs. 56.1 ¶ 17); *see also* Reply Declaration of Jennette Wohlars ¶ 3, Dkt. 43 (hereinafter, "Wohlars Reply Decl.") ("When I could assign Matias to work in the ambulatory holding area for a day or two, as I did on July 16, 17 and 19, 2018, I would do so.").

Plaintiff was persistently late to work.  According to Wohlars, Plaintiff was late on sixty different occasions between July 29, 2017 and July 14, 2018.  Wohlars Decl. ¶ 23.  Plaintiff received a verbal warning on June 8, 2017, a written warning on January 24, 2018, and a final written warning on April 13, 2018 for being late three times during the month of February and twelve times during the month of March.  Defs. 56.1 ¶¶ 25–27; Wohlars Decl. ¶¶ 28–30. Plaintiff claims that her "injured knee required her to exercise it every day before coming to work[] and slowed her down so as to make it more difficult to come precisely on time given [her] long commute," but Plaintiff never submitted a doctor's note related to her tardiness.  Pl. Opp. at 7; Defs. 56.1 ¶ 28.[5]  Under Montefiore's policy regarding absenteeism and lateness, an employee is deemed to be excessively late when he or she is late three or more times in one month.  Defs. 56.1 ¶ 58.

In addition to lateness, Plaintiff has a disciplinary record dating back to 2016.  *See* Wohlars Decl. ¶ 19; Pl. 56.1 ¶¶ 23–24.  Between 2016 and 2018, Wohlars received complaints about Plaintiff's inappropriate behavior, including unprofessional conduct in front of patients, not properly operating hospital equipment, yelling, and being aggressive and confrontational with her patients and co-workers.  Wohlars Decl. ¶¶ 19–20.  For example, on August 16, 2016, Plaintiff was issued a written warning for administering an unnecessary electric shock to a conscious patient.  Pl. 56.1 ¶ 23.[6]

---

[5]    The only doctor's note Defendants have on file for Plaintiff is from July 2017, which stated that Plaintiff would be able to return to regular duties on August 2, 2017.  Defs. 56.1 ¶¶ 28, 36–37.  Plaintiff asserts that "Defendants never notified Plaintiff that she needed to provide any note from her doctor to excuse her lateness."  *Id.* ¶ 28; Pl. Opp. at 7.

[6]    Plaintiff admits to the incident but blames the error on Catherine Dries, the Patient Care Coordinator; Plaintiff asserts that she "did not see the shock pads were on a sleeping patient, and inadvertently delivered an unneeded shock to the patient."  Pl. 56.1 ¶ 23.

Wohlars also claims that Plaintiff engaged in inappropriate discussions of her political and religious beliefs while at work.  Wohlars Decl. ¶¶ 20–23.  For example, Plaintiff once stated in front of a patient that "all Democrats are idiots," and, at a different time, accused a cardiovascular technician of "killing children" by supporting Hillary Clinton.  *See* Wohlars Decl. ¶ 20.  On October 20, 2016, Wohlars issued Plaintiff an "official coaching" for several inappropriate interactions with her co-worker Catherine Dries ("Dries").  Pl. 56.1 ¶ 24; Wohlars Decl. ¶ 18.[7]  According to Plaintiff, "on at least three (3) separate occasions, each in 2017 or early 2018, Defendant Wohlars berated Plaintiff for speaking about her religious beliefs," whereas "other nurses and staff were not barred" from such speech.  Pl. Opp. at 9; Pl. 56.1 ¶¶ 65–66.[8]

On June 28, 2018, Plaintiff and Dries had a verbal altercation during which Plaintiff raised her voice.  Pl. 56.1 ¶¶ 31–32.  When Wohlars told Plaintiff that she wanted to discuss a disciplinary matter with her the following day, Plaintiff responded by email that she was "not going to waste time" and that Wohlars "would not believe her" regarding the incident with Dries. *Id.* ¶ 33.  In the email, Plaintiff "rant[ed] about the destruction of the Catholic Church and Christianity, abortion and same sex marriages and referring to those who did not share

---

[7]     Wohlars personally witnessed these interactions and asserts that Plaintiff was "rude, disrespectful, and confrontational" with Dries in front of several patients.  Wohlars Decl. ¶ 18; Ex. F, Dkt. 36-6.

[8]     Plaintiff's cited support for her assertion that other staff were not barred from discussing their religious beliefs, *see* Decl. of Marshall Bellovin, Dkt. 41-2 at 229:20–25 (hereinafter "Pl. Dep. Tr."), does not, in fact, support that assertion.  Plaintiff admits that Wohlars told all employees not to discuss religion at work.  Pl. 56.1 ¶ 66 (admitting that Wohlars "told all employees during a staff meeting that they should not discuss religion in the work environment").

[Plaintiff's] view of her faith as 'lost cafeteria Catholics.'"  Wohlars Decl. ¶ 22; *see also* Ex. H, Dkt. 36-8.  The following day, June 29, 2018, Plaintiff called out sick.  Pl. 56.1 ¶ 34.[9]

A little more than a week after the incident with Dries, Plaintiff requested FMLA leave because she was scheduled to have knee surgery in August 2018.  *See* Pl. 56.1 ¶¶ 45, 47; Pl. Opp. at 3.  Plaintiff had made an earlier oral request for FMLA leave in May 2018 "but did not provide a specific period of time that she anticipated that she would be away from work;" she requested the medical leave form "in the event that she needed to be out of work prior to the time that she was going to have surgery."[10]  Defs. 56.1 ¶¶ 43–45.  According to Defendants, because Plaintiff did not yet know the projected duration of her leave and because "FMLA [leave] cannot be requested more than 30 days in advance," Plaintiff's May 2018 request was not processed.  *See id.* ¶ 45.

On July 9, 2018, Plaintiff asked Wohlars to assist her with submitting an FMLA leave request.[11]  Pl. 56.1 ¶ 47.  On July 10, 2018, Wohlars confirmed that she had submitted Plaintiff's request for FMLA leave.  *Id.* ¶ 48.  Over the course of approximately two weeks, Plaintiff pursued her leave request with Wohlars's assistance.  *Id.* ¶¶ 48–51.  On July 23, 2018, Plaintiff faxed her completed FMLA forms to Montefiore's leave department.  Pl. Opp. at 6; Pl. 56.1 ¶¶

---

[9]      At some point prior to the June 2018 altercation with Dries, Plaintiff opted not to donate to a wedding gift for a co-worker who entered into a same-sex marriage.  Pl. Opp. at 8; Pl. 56.1 ¶ 62.  According to Plaintiff, her refusal to donate to the gift was due to her Catholic values and it led to harassment from Dries.  Pl. 56.1 ¶ 62; Pl. Opp. at 8–9.

[10]      Wohlars claims that this is when she first became aware of Plaintiff's physical limitations.  Defs. 56.1 ¶ 20. Plaintiff, however, asserts that Wohlars became aware of her condition "in about early 2017" when Plaintiff "began requesting to be assigned to areas that do not require heavy lifting."  Pl. 56.1 ¶ 20.  This dispute of fact is not material.

[11]      Montefiore's leave policy requires an employee to complete the first page of the FMLA form and the manager to complete the second page and submit it to the "Central Leave" department.  Defs. 56.1 ¶¶ 42–43. Central Leave then follows up with the employee if additional information, such as documentation from a physician, is required.  *Id.*

52–53.  The following day, Plaintiff asked Wohlars to submit her claim for short-term disability.
*Id.*

On July 10, 2018, the same day that Wohlars submitted Plaintiff's FMLA paperwork,
Wohlars received approval from Labor Relations to terminate Plaintiff based on chronic
tardiness and "the offensive and insubordinate nature" of Plaintiff's June 28 email to Wohlars.[12]
Wohlars Decl. ¶ 32; *see also* Pl. 56.1 ¶ 59.  On July 23, 2018, Wohlars asked to meet with
Plaintiff and a Union representative on July 25, 2018; because Plaintiff called out sick the day of
the meeting, the meeting never occurred.  Wohlars Decl. ¶ 33.  Wohlars then mailed Plaintiff a
notice of discipline dated July 26, 2018, advising Plaintiff that her employment with Montefiore
had been terminated effective immediately.[13]  Pl. 56.1 ¶ 56.

On April 6, 2020, Plaintiff sued Defendants for age and disability discrimination,
hostile work environment based on her religion, and FMLA interference and retaliation.[14]  *See*
Compl.  Plaintiff argues that Defendants "constantly harassed and discriminated against" her
"throughout Plaintiff's time working for Defendants . . . beginning in 2016 and escalating until
Plaintiff's termination."  Pl. Opp. at 8.  In short, Plaintiff argues that Defendants discriminated
against Plaintiff by denying Plaintiff's requests for reasonable accommodations and requests for

---

[12]     The date on which Wohlars initiated the request to terminate Plaintiff is not in the record.

[13]     The purpose of the July 25 meeting, according to Wohlars, was to "notify Matias that her employment was
being terminated," a decision that "had already been made by July 23, 2018."  Wohlars Decl. ¶¶ 33–34.

[14]     Although Plaintiff argues in her opposition papers that she was discriminated against on the basis of her
religion, Plaintiff's complaint alleges only hostile work environment claims based on religion; there is no separate
cause of action for religious discrimination.  *See* Compl. ¶¶ 101–16.  Because there is no claim that she was
terminated because of her religion, the Court will disregard the parties' arguments on that issue.

Similarly, Defendants argue that they are entitled to summary judgment on Plaintiff's claim for age
discrimination under Title VII.  *See* Defs. Mem. of Law at 8–9.  Plaintiff has not, however, brought such a claim;
she alleges age discrimination only under the ADEA, the OWBPA, the NYSHRL, and the NYCHRL.  *See* Compl.
¶¶ 57–74.

FMLA medical leave, and ultimately terminated Plaintiff due to her age, religion, disability, and requests for FMLA medical leave.  Pl. Opp. at 9–10.  Defendants have moved for summary judgment on all of Plaintiff's claims.  Defs. Mem. of Law.  For the reasons discussed below, Defendants' motion is GRANTED.

## DISCUSSION

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, (1986).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  *Scott v. Harris,* 550 U.S. 372, 380, 127 (2007) (internal quotation marks and citation omitted).

While the Court must construe the facts in the light most favorable to the non-moving party, "a party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."  *Fed. Trade Comm'n v. Moses*, 913 F.3d 297, 305 (2d Cir. 2019) (internal quotation marks and citation omitted).  Accordingly, to defeat a motion for summary judgment, the nonmoving party must produce "specific facts showing that there is a genuine issue for trial;" a "scintilla of evidence" is not enough.  *Fincher v. Depository Tr.*, 604 F.3d 712, 726 (2d Cir. 2010) (internal quotation marks and citation omitted); *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006); *see also D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998) (a party "must offer some hard evidence showing that [her] version of the events is not wholly fanciful"); *Baity v. Kralik*, 51 F. Supp. 3d 414, 417–18 (S.D.N.Y. 2014) (a party opposing summary judgment must "specifically respond to the assertion of each

purported undisputed fact . . . and, if controverting any such fact, [must] support its position by citing to admissible evidence in the record").

Defendants have moved for summary judgment on all of Plaintiff's claims, arguing that there is no evidence that Plaintiff was discriminated against or harassed based on any protected characteristic.  Defs. Mem. of Law at 1.  Defendants further argue that Plaintiff cannot meet her burden to show that Defendants discriminated against her by failing to provide her with a reasonable accommodation when no such accommodation could be made given the essential functions of her position.  *Id.*  Finally, Defendants argue that Plaintiff's allegations regarding a hostile work environment are unconnected to any protected status and fail as a matter of law, and that Plaintiff has failed to establish that she was denied any rights under the FMLA.  *Id.* at 2.

## I.    Plaintiff's Age and Disability Discrimination Claims

Discrimination claims brought pursuant to the ADA, ADEA, NYSHRL, and NYCHRL are analyzed using "the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973)."  *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012); *see also Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 75–76 (2d Cir. 2015); *Gorzynski v. Jet Blue Airways Corp.*, 596 F.3d 93, 106 (2d Cir. 2010); *Sista*, 445 F.3d at 169.

"Under *McDonnell Douglas*, a plaintiff bears the initial burden of proving by a preponderance of the evidence a *prima facie* case of discrimination; it is then the defendant's burden to proffer a legitimate non-discriminatory reason for its actions; the final and ultimate burden is on the plaintiff to establish that the defendant's reason is in fact pretext for unlawful discrimination."  *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 251 (2d Cir. 2014); *see also Ya-Chen Chen*, 805 F.3d at 76; *Gorzynski*, 596 F.3d at 106; *Sista*, 445 F.3d at 169.

To establish a prima facie case of discrimination under the ADA, ADEA, and NYSHRL, Plaintiff must establish but-for causation. *See Natofsky v. City of New York*, 921 F.3d 337, 348 (2d Cir. 2019) ("[T]he ADA requires a plaintiff alleging a claim of employment discrimination to prove that discrimination was the but-for cause of any adverse employment action."); *Gorzynski,* 596 F.3d at 106 ("[A] plaintiff bringing a . . . claim pursuant to the ADEA must prove, by a preponderance of the evidence, that [a protected characteristic] was the 'but-for' cause of the challenged adverse employment action and not just a contributing or motivating factor.") (citation omitted); *Morrison v. Millenium Hotels*, 2021 WL 1534293, at *6 (S.D.N.Y. Apr. 19, 2021) ("Although New York courts have not definitively decided whether the NYSHRL, like . . . the ADEA, requires but-for causation, federal courts in this circuit have consistently treated the NYSHRL and the federal analogs as employing the same substantive standard.") (citations omitted).  By contrast, under the NYCHRL, Plaintiff need only establish that she was treated less well than other employees based on her protected status.  *See, e.g.*, *Mihalik v. Credit Agricole Cheuivreux N. Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013) (under the NYCHRL, plaintiff need only demonstrate "differential treatment — that she [was] treated 'less well' — because of a discriminatory intent") (quoting *Williams v. N.Y.C. Hous. Auth.*, 61 A.D.3d 62, 78 (1st Dep't 2009)).

The plaintiff's burden of proof to survive summary judgment "at the prima facie stage is *de minimis*." *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994) (citation omitted).  "Even in the discrimination context, however, a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (quoting *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)); *see also, e.g.*, *Dickens v. Hudson Sheraton Corp.*, 167 F. Supp. 3d 499, 510 (S.D.N.Y. 2016)

("[W]hen an employer provides convincing evidence to explain its conduct and the plaintiff's argument consists of purely conclusory allegations of discrimination . . . the Court may conclude that no material issue of fact exists.").

### A. Age Discrimination Under the ADEA, the OWBPA, the NYSHRL, and the NYCHRL

Plaintiff has asserted claims for age discrimination under the ADEA, the OWBPA,[15] the NYSHRL, and the NYCHRL. *See* Compl. ¶¶ 57–74.

To establish a prima facie case of age discrimination under federal and state law, Plaintiff must show that: (1) she is a member of the protected class; (2) she was qualified for the position she held; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent. *Gorzynski*, 596 F.3d at 107. The first two elements of an NYCHRL claim are the same as claims under federal and state law, but "important differences exist as to the third and fourth elements": under local law, a plaintiff need only show that she was treated differently than a worker who was not a member of her protected class in a way that is "more than trivial, insubstantial, or petty." *Maynard v. Montefiore Med. Ctr.*, 2021 WL 396700, at *5 (S.D.N.Y. Feb. 4, 2021) (internal quotation marks and citations omitted).

Defendants do not contest that: (1) Plaintiff was a member of the protected age class at the time of her hiring and firing; (2) Plaintiff was qualified for her position; and (3) Plaintiff's termination constitutes an adverse employment action. *See* Defs. Mem. of Law at 8–11; Defs. 56.1 ¶¶ 6–9. The parties dispute only the final element of Plaintiff's age discrimination claim,

---

[15]     The Older Workers Benefit Protection Act ("OWBPA") is an amendment to the ADEA "designed to protect the rights and benefits of older workers." *Oubre v. Entergy Operations, Inc.*, 522 U.S. 422, 426–27 (1998). Courts in this district have repeatedly recognized, however, that the OWBPA "does not create a private cause of action and cannot be separate from a violation of the ADEA." *Karunakaran v. Borough of Manhattan Cmty. Coll.*, 2021 WL 535490, at *3 (S.D.N.Y. Feb. 12, 2021) (collecting cases).

namely, whether Plaintiff can prove that the adverse employment action, *i.e.*, her firing,[16]

occurred under circumstances giving rise to an inference of discriminatory intent, or, under the

NYCHRL, that Plaintiff was treated less well than a younger coworker based on age.

"An inference of discrimination can arise from circumstances including, but not limited

to, the employer's criticism of the plaintiff's performance in [age-based] degrading terms; or its

invidious comments about others in the employee's protected group; or the more favorable

treatment of employees not in the protected group; or the sequence of events leading to" the

adverse employment action.  *Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015)

(citation omitted); *see also Chambers*, 43 F.3d at 37 (same).

Defendants argue that Plaintiff has presented "no facts to support her claim," as this case

"does not involve comments or statements that reflect a bias against Matias based on her age."

Defs. Mem. of Law at 9.  Defendants further argue that Plaintiff's claim is undermined because:

(1) Plaintiff was already a member of the protected age class when Defendants hired her; and (2)

the same actor, Defendant Wohlars, hired and fired Plaintiff, thereby suggesting that age was not

the driving factor in Plaintiff's termination.  *See id.* at 10.

---

[16]     Plaintiff alleges that she suffered other adverse employment actions because she was: (1) given "unfair, damaging work assignments"; (2) "denied reasonable accommodations for documented disability"; (3) subjected to "verbal abuse" because she was told to "find a new job"; and (4) "reprimanded separately for disability-caused lateness and for discussing her religious views."  Pl. Opp. at 13–14.  Even if true, such allegations do not constitute adverse employment actions.  An adverse employment action is defined as a "materially adverse change in the terms and conditions of employment."  *Hrisinko v. N.Y.C. Dep't of Educ.*, 369 F. App'x 232, 235 (2d Cir. 2010) (quoting *Galabya v. N.Y. City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000)).  To qualify as "materially adverse," a change in working conditions must be "more disruptive than mere inconvenience or an alteration of job responsibilities." *Id.* (citation omitted).  "[A] failure to provide a reasonable accommodation in and of itself does not equate to an adverse employment action."  *Berger v. N.Y.C. Police Dep't*, 304 F. Supp. 3d 360, 368 (S.D.N.Y. 2018).  "[I]t is not enough that defendants[ ] gave plaintiff a subjectively less preferred . . . assignment; the assignment must be materially less prestigious, materially less suited to h[er] skills and expertise, or materially less conducive to career advancement."  *Kunik v. N.Y.C. Dep't of Educ.*, 436 F. Supp. 3d 684, 694 (S.D.N.Y. 2020), *aff'd*, 842 F. App'x 668 (2d Cir. 2021).  Here, Plaintiff has not established that any of Defendants' actions about which she complains, other than Plaintiff's termination, was materially adverse.

Plaintiff argues that she has established a prima facie case of age discrimination because she has shown that: (1) the reasons given for Defendants' adverse actions were pretextual; and (2) Plaintiff was denied reasonable accommodations given to three similarly situated coworkers, "one of whom Plaintiff testified was certainly younger." Pl. Opp. at 15 (citations omitted); *see also id.* at 17. Moreover, Plaintiff asserts, with no facts to support her assertion, that younger, non-Catholic nurses "routinely came late without receiving any discipline." Pl. 56.1 ¶ 76.[17]

Plaintiff has not produced any evidence that Defendants engaged in explicit age-based discrimination, as Plaintiff has not pointed to any statements by Defendants disparaging Plaintiff or anyone else based on age. Plaintiff alleges only that she was treated differently from similarly situated coworkers, one of whom is younger than Plaintiff. Pl. Opp. at 15. But Plaintiff's only evidence of her co-worker's age is her own deposition testimony, in which she testified that her coworker, Verushka Santana ("Santana"), is "a friend of mine. I know she's younger than me." *See* Pl. Dep. Tr. at 188:23–89:31. Plaintiff has not, however, established Santana's age, leaving open the possibility that, while younger than Plaintiff, Santana is nevertheless a member of the protected class, and thus an inappropriate point of comparison for Plaintiff's age discrimination claims. Moreover, Plaintiff offers no evidence (other than her own speculation) to show that Santana received different treatment *because of* her age. Plaintiff further admitted in her deposition that both of the other coworkers to whom she compares herself, Dries and Maureen Barry ("Barry"), are older than Plaintiff, which puts them in the same protected age group as Plaintiff. *See* Pl. Dep. Tr. at 188:18–19.

---

[17]     Plaintiff also argued in her deposition that she was subjected to age discrimination because: (1) arthritis generally occurs in older people; and (2) Defendants knew she was only 850 hours away from receiving her pension. *See* Pl. Dep. Tr. at 214:17–215:23. These arguments, however, are mere speculation by Plaintiff and are not supported by any evidence in the record.

Plaintiff's age discrimination claim is further undermined because, as Defendants point out, Plaintiff was already a member of the protected age class when Defendants hired her, and the same person, Defendant Wohlars, hired and fired Plaintiff. *See, e.g.*, *Stanojev v. Ebasco Servs., Inc.*, 643 F.2d 914, 921 (2d Cir. 1981) (finding no direct evidence of age discrimination when Plaintiff "was taken into the company at the executive level when he was already 11 years into the [protected] age bracket"); *Snowden v. Trs. of Columbia Univ.*, 2014 WL 1274514, at *8 (S.D.N.Y. Mar. 26, 2014), *aff'd*, 612 F. App'x 7 (2d Cir. 2015) ("Where, as here, an employee is already a member of the protected class when hired, any inference of age discrimination when her employment is terminated is undermined."); *see also Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 137 (2d Cir. 1998) ("When the same actor hires a person already within the protected class, and then later fires that same person, 'it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire.'") (quoting *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir.1997)).

The dearth of evidence demonstrating Defendants discriminated against Plaintiff because of her age dooms Plaintiff's federal and state claims. Plaintiff has failed to produce any evidence that even remotely demonstrates that age discrimination had anything to do with her termination, let alone was the but-for cause. *See Natofsky*, 921 F.3d at 348; *Gorzynski*, 596 F.3d at 106; *Morrison*, 2021 WL 1534293, at *6. Nor has Plaintiff demonstrated evidence sufficient to meet the NYCHRL's lower age discrimination standard, as she has failed to demonstrate that another employee who is outside the protected class was treated differently based on age. *See Gorokhovsky v. N.Y.C. Hous. Auth.*, 552 F. App'x 100, 102 (2d Cir. 2014) (summary order) (requiring plaintiff to show "differential treatment of any degree based on a discriminatory motive"); *see also Velazco v. Columbus Citizens Found.*, 778 F.3d 409, 411 (2d Cir. 2015)

(requiring "any causal link between age bias and plaintiff's firing") (citing *Bennett v. Health Mgmt. Sys., Inc.,* 92 A.D.3d 29, 40 (1st Dep't 2011)).  Thus, Plaintiff has failed to meet even her lower burden under the NYCHRL.

In sum, Plaintiff has failed to make out a prima facie case of age discrimination under federal, state, or city law, having offered no evidence that even remotely tends to show that Defendants discriminated against her based on her age.  Accordingly, Defendants are entitled to summary judgment on these claims.

### B.    Disability Discrimination Under the ADA, the NYSHRL, and the NYCHRL

Plaintiff has also asserted claims for disability discrimination under the ADA, the NYSHRL, and the NYCHRL.  *See* Compl. ¶¶ 75–87.

All three statutes prohibit employers from discriminating against an individual based on disability in the terms, conditions, or privileges of employment.  *See* 42 U.S.C. § 12112(a); N.Y. Exec. Law § 296(1)(a); N.Y.C. Admin. Code § 8–107(1)(a).  "Courts generally apply the same standard to ADA, NYSHRL and NYCHRL claims on a motion for summary judgment, in view of the largely coextensive scope of the ADA and NYSHRL, and the fact that both are considered to be 'a floor below which the [NYCHRL] cannot fall.'"  *Makinen v. City of New York*, 53 F. Supp. 3d 676, 690 (S.D.N.Y. 2014) (quoting *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009)).  Accordingly, the Court need only address Plaintiff's NYCHRL claim in the event that her federal and state claims fail.  *See id.*

Under the ADA, a plaintiff establishes a prima facie case of discrimination by showing that: (1) her employer is subject to the ADA; (2) she was disabled within the meaning of the ADA; (3) she was otherwise qualified to perform the essential functions of her job, with or without a reasonable accommodation; and (4) she suffered an adverse employment action

because of her disability.  *McMillan v. City of New York*, 711 F.3d 120, 125–26 (2d Cir. 2013)

(quoting *Sista*, 445 F.3d at 169).  The parties dispute only the last two elements.[18]

### 1. Qualified to Perform the Essential Functions of the Job

In order to prevail on a claim of disability discrimination, a disabled Plaintiff must prove

either that she can meet the requirements of the job without assistance or that a reasonable

accommodation exists that permits her to perform the job's essential functions.  *Rodal v.*

*Anesthesia Grp. of Onondaga, P.C.*, 369 F.3d 113, 120 (2d Cir. 2004); *Borkowski v. Valley Cent.*

*Sch. Dist.*, 63 F.3d 131, 137–38 (2d Cir. 1995).  "Essential functions are defined . . . to mean the

fundamental duties to be performed in the position in question, but not functions that are merely

marginal."  *Shannon v. N.Y.C. Transit Auth.*, 332 F.3d 95, 100 (2d Cir. 2003) (citation and

quotations omitted).  In evaluating whether a particular job function is "essential," courts

consider several factors, including "the employer's judgment, written job descriptions, the

amount of time spent on the job performing the function, the mention of the function in a

collective bargaining agreement, the work experience of past employees in the position, and the

work experience of current employees in similar positions."  *Stevens v. Rite Aid Corp.*, 851 F.3d

224, 229 (2d Cir. 2017) (quoting *McMillan*, 711 F.3d at 126).

Courts "must give considerable deference to an employer's judgment regarding what

functions are essential for service in a particular position," but "no one listed factor will be

dispositive."  *Id.* (citations omitted).  Courts must conduct "a fact-specific inquiry into both the

employer's description of a job and how the job is actually performed in practice."  *McMillan*,

711 F.3d at 126; *see also Rodal*, 369 F.3d at 120 ("[U]ltimately, the question whether a task

constitutes an essential function depends on the totality of the circumstances.").

---

[18]     Defendants do not dispute that Montefiore is subject to the ADA or, "solely for the purposes of this motion," that Plaintiff is disabled within the meaning of the ADA.  Defs. Mem. of Law at 12.

Defendants assert that, as a registered nurse in the Cath Lab, Plaintiff was "responsible for providing critical care to her patients that often involved the need to lift, bend and respond to patient needs on an expedited basis."  Defs. Mem. of Law at 13–14; Defs. 56.1 ¶¶ 17, 19; *see also* Wohlars Decl. ¶ 12 ("There is no such thing as 'light duty work' available in the Cath Lab.  All of our nursing staff must be able to assist our patients, many of whom are obese or overweight, to get up and move around while their examinations are underway or testing is being performed.  In addition, the staff must be able to assist and perform CPR or other lifesaving techniques on patients at any moment.").  Further, while Defendants admit that "there are areas within the department that do not require as much physical activity such as lifting or moving patients or equipment," they insist that "*all* of [their] nurses must be able to operate in *all* areas."  Wohlars Reply Decl. ¶ 3 (emphasis in original); *see also* Wohlars Decl. ¶ 14 ("In our procedure room, . . .  staff [are] required to wear a heavy lead apron to protect themselves from potential exposure.  Although this is not required in other areas of the Cath Lab, . . . all of the work has physical requirements.").

Plaintiff challenges Defendants' position that being able to do heavy lifting is an essential duty and points to three other nurses (Dries, Santana and Barry) who were in areas that, according to Plaintiff, did not require heavy lifting.  *See* Pl. Opp. at 12 (citations omitted); Pl. 56.1 ¶ 19 (claiming that Dries, Barry, and Santana "were not required to carry heavy equipment or work in the operating room").  Defendants have presented compelling evidence, however, that there are no light duty positions in the Cath Lab, and that all registered nurses, like Plaintiff, "are responsible for the full range of cardiac care from pre-op to post-op procedures."  Defs. 56.1 ¶ 19.  Defendants' position is supported by the job description for nurses, which specifies under "Physical Requirements" that nurses are responsible for: "Heavy work: Exerting up to 100

16

pounds of force occasionally and/or up to 50 pounds of force frequently and/or up to 20 pounds of force constantly to move objects." Wohlars Decl., Ex. D at 8, Dkt. 36-4. The job description also specifies that the position "requires bending, lifting, reaching, standing, walking, sitting, manual dexterity and responding quickly in [a] variety of situations and for an extended period of time." *Id.* As Wohlars explained, "[t]he Cath Lab is a very busy and high pressure area" that "generally see[s] about two dozen patients each day. As an invasive cardiac unit, the majority of [its] patients have serious coronary issues. [Its] patients have various levels of mobility, from ambulatory patients who come in on their own, to patients who are confined to a wheelchair or are on a stretcher." Wohlars Decl. ¶ 11.

Defendants' judgment about the essential functions of Plaintiff's job is not, however, dispositive. *See Stone v. City of Mount Vernon*, 118 F.3d 92, 97 (2d Cir. 1997). The Court must consider whether, notwithstanding Defendants' testimony and Plaintiff's job description, other evidence creates a question of fact whether "heavy work" is, in fact, an essential function of the registered nurse position in the Cath Lab.

The only evidence Plaintiff has propounded to the contrary is her own testimony that her colleagues Dries, Barry, and Santana "were not required to carry heavy equipment or work in the operating room." *See* Pl. Opp. at 12; *see also* Pl. 56.1 ¶¶ 6, 19. Dries is not an appropriate point of comparison, however, because as a Patient Care Coordinator, Dries fulfilled "mostly an administrative and oversight role;" her primary function was to "prepar[e] and review[] plans of care for patients, . . . supervis[e] admissions and discharges," and to work "in the procedure room when needed." *See* Wohlars Reply Decl. ¶¶ 4–5. By contrast, Plaintiff's "job was as a registered nurse providing direct care to patients." *Id.*; *see also id.*, Ex. A, Dkt. 43-1; Bellovin Decl., Ex. 3 at 46:24–48:10, Dkt. 41-3 (hereinafter "Wohlars Dep. Tr."). The other two

employees, Barry and Santana, while more frequently assigned to pre- and post-op areas,[19] were also required to work in the procedure room when needed, meaning that the physical demands of doing so, including heavy lifting and wearing a lead vest, remained part of their jobs.[20]  *See* Wohlars Reply Decl. ¶ 5 ("Dries, as well as Barry, were both members of the department's STEMI team which is on call to come in to handle acute cases in the procedure room."); *see also id.* ¶ 6 ("Santana was required, and did in fact, also work in the procedure room when requested."); *see also* Wohlars Dep. Tr. at 52:4–53:2, 53:13–54:10, 55:8–20, 56:23–57:3, 57:22–23.  In short, Plaintiff has failed to rebut Defendants' showing that heavy lifting is an essential feature of the registered nurse position in the Cath Lab.

Because there is no dispute that Plaintiff could not perform the essential functions of her job without accommodation, the question then becomes whether there was a reasonable accommodation that would have allowed Plaintiff to perform the essential functions of her job. To make out a prima facie case of disability discrimination arising from a failure to accommodate, Plaintiff must show that: (1) she is disabled within the meaning of the ADA; (2) her employer had notice of her disability; (3) with reasonable accommodation, she could perform the essential functions of her job; and (4) the employer refused to accommodate her.  *McBride v.*

---

[19]     While Santana is also a registered nurse, Defendants have explained that she "would often work in the pre- and post-op areas of the Cath Lab . . . because she was fluent in Spanish [unlike Plaintiff] and could easily communicate with the growing number of exclusively Spanish speaking patients and family members."  Wohlars Reply Decl. ¶ 6; *see also* Wohlars Dep. Tr. at 49:10–50:17.  With respect to Barry, Wohlars testified that Barry worked primarily in pre- and post-op because of the timing of her shift.  *See, e.g.*, Wohlars Dep. Tr. 56:11–13, 19–23 ("She was assigned primarily [to pre- and post-op] — her shifts started at 6:00 a.m.  That's when our patients start arriving.  As I've stated before, based on your shift may be where you're assigned more often.").  Wohlars offered to adjust Plaintiff's shift start time "to accommodate her commuting difficulties," but Plaintiff refused.  Wohlars Reply Decl. ¶ 12; *see also* Wohlars Decl., Ex. K, Dkt. 36-11.

[20]     Plaintiff admits that Dries and Barry worked in the procedure room where heavy lifting was necessary but claims that Santana only works in "ambulatory," an assignment that does not require a heavy apron or heavy lifting.  *See* Pl. Dep. Tr. at 251:24–252:25.  Plaintiff's testimony on this point appears to be based solely on her own observations; she does not directly refute Defendants' evidence that Santana was also required, at times, to work in the procedures room.

*BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 97 (2d Cir. 2009) (quoting *Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 184 (2d Cir. 2006)).  Plaintiff "bears the burdens of both production and persuasion as to the existence of some accommodation that would allow her to perform the essential functions of her employment."  *Id.*

A reasonable accommodation "can never involve the elimination of an essential function of a job."  *Shannon*, 332 F.3d at 100; *see also Stevens*, 851 F.3d at 229 ("[E]mployers may not discriminate against people with disabilities that do not prevent job performance, but when a disability renders a person unable to perform the essential functions of the job, that disability renders him or her unqualified.").  Nor must an employer shift essential responsibilities to other employees as a means of accommodating a disabled employee.  *See, e.g.*, *Davidson v. LaGrange Fire Dist.*, 523 F. App'x 838, 839 (2d Cir. 2013) (summary order); *Graves*, 457 F.3d at 186–87; *see also Borkowski*, 63 F.3d at 140 ("[I]ndividuals whose physical condition precludes them from engaging in heavy lifting, and who [have] jobs for which such lifting is shown to be an essential function, need not be accommodated by shifting responsibility for the lifting to other individuals.").

Plaintiff has not established the existence of a reasonable accommodation that would have allowed her to perform the essential functions of a registered nurse in the Cath Lab.  Even if Defendants could have provided the accommodation Plaintiff requested, *e.g.*, reassigning Plaintiff to areas with less heavy lifting, such an accommodation would not have been reasonable, as it would have required the elimination of an essential function of the job.[21]

---

[21]    Plaintiff herself admits that her physical condition had deteriorated to the point where she presented a danger to herself and to the safety of her patients. Defs. Mem. of Law at 13 (citing Compl. ¶¶ 35–37); *see also* Pl. Opp. at 5 (admitting that "Plaintiff was unable to move patients from their stretchers to the operating table and then back to the stretcher," and that "Plaintiff twice tripped in the procedure room due to her injured knee and at one point almost let a patient fall off a stretcher because Plaintiff's deteriorating knee prevented her from pushing the stretcher properly and locking the wheels"); Bellovin Decl., Ex. 5, Dkt. 41-5 (hereinafter, "Matias Aff.") ("I can no longer function safely, both for myself and for the patients.").

Plaintiff has simply provided no evidence that, given her physical limitations, any proposed accommodation would have allowed her to perform the essential functions of her job; without such evidence, she cannot make out a prima facie case of disability discrimination. *See, e.g.*, *McBride*, 583 at 103 (plaintiff failed to establish prima facie case of discrimination where she "failed to make a sufficient showing that she is capable of performing the essential functions of either her pre-disability position or some other position to which she could have been reassigned").

In sum, Plaintiff has failed to make out a prima facie case of disability discrimination because she has failed to demonstrate that heavy work was not an essential function of her position (it was), or that she would have been able to perform such work with a reasonable accommodation (she could not). Thus, Defendants are entitled to summary judgment on Plaintiff's claims of disability discrimination.

### 2. Adverse Employment Action Because of Disability

In addition to failing to prove that she was qualified for her position with or without a reasonable accommodation, Plaintiff's federal and state claims must also fail because she has offered no evidence that she was terminated because of her disability.

As already explained, "[a]n inference of discrimination can arise from circumstances including, but not limited to, the employer's criticism of the plaintiff's performance in [disability-based] degrading terms;" the employer's "invidious comments about others in the [plaintiff]'s protected group;" "more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge." *Littlejohn*, 795 F.3d at 312 (internal quotation marks and citation omitted).

Plaintiff has offered less evidence that she was treated differently based on her disability than that she was treated differently because of her age.  She has produced no evidence of comments disparaging Plaintiff or anyone else based on disability, nor has she even argued that disability motivated her termination (only Plaintiff's age and religion).  *See* Pl. Opp. at 15–16.  Plaintiff's only evidence of disability discrimination is her own assertion that: (1) on numerous occasions, Defendants denied her requested accommodation that she be "given tasks that are primarily without heavy lifting;" and (2) other coworkers were granted that accommodation when Plaintiff was not.  Matias Aff. ¶¶ 15–16; *see also id.* ¶¶ 32, 34.  But a failure to provide a reasonable accommodation can only be used to prove animus based on disability if the other elements of the claim have also been proven.  *See Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 332 (2d Cir. 2000) ("We have ruled that failure to make reasonable accommodation, when the employee has satisfied the first three elements of [her] claim, amounts to discharge 'because of' [her] disability."); *Nakis v. Potter*, 422 F. Supp. 2d 398, 422 (S.D.N.Y. 2006) (same).

Accordingly, because Plaintiff has not proved that she could perform the essential functions of her job with a reasonable accommodation and she has not proved animus based on disability, Defendants are entitled to summary judgment on Plaintiff's ADA and NYSHRL claims.

### 3. NYCHRL Claim

Plaintiff's disability discrimination claim also fails under the NYCHRL because she has not established that she was treated less well than other employees because of her disability.  *See, e.g.*, *Gorokhovsky*, 552 F. App'x at 102 (requiring plaintiff to show "differential treatment of any degree based on a discriminatory motive").  Plaintiff has asserted that her coworkers, Dries, Barry, and Santana, were granted accommodations based on disability but Plaintiff was not.  *See,*

*e.g.*, Pl. Dep. Tr. at 191:18–193:16.  Because Plaintiff only compares herself to individuals

within the same protected class, she has not made out a claim pursuant to the NYCHRL.  *Cf.*

*Kellman v. Metro. Transp. Auth.*, 8 F. Supp. 3d 351, 380 (S.D.N.Y. 2014) ("Under the

NYCHRL, 'the [final prong] of the prima facie case is satisfied if a member of a protected class

was treated differently than a worker who was not a member of that protected class.'") (citation

omitted).  Accordingly, Defendants are also entitled to summary judgment on Plaintiff's

NYCHRL claim.

In sum, Defendants are entitled to summary judgment on all of Plaintiff's age and

disability discrimination claims because Plaintiff has failed to establish a prima facie case of

discrimination.[22]

## II.   Plaintiff's Hostile Work Environment Claims

Plaintiff has also brought hostile work environment claims under Title VII, the NYSHRL,

and the NYCHRL based on the purportedly "continuous nature of Defendants' religion-based

discriminatory and disparate treatment of Plaintiff."  *See* Compl. ¶¶ 101–16.

To prove a hostile work environment claim under Title VII and the NYSHRL, Plaintiff

must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult

that is sufficiently severe or pervasive to alter the conditions of the victim's employment and

---

[22]    Even if Plaintiff had established a prima facie case of disability or age discrimination, Defendants would
nonetheless be entitled to summary judgment because Defendants have offered legitimate, non-discriminatory
reasons for firing Plaintiff.  The undisputed record shows that human resources approved Plaintiff's firing
"[b]ecause Matias had reached the level of termination for her chronic lateness under Montefiore's progressive
disciplinary policy and because Matias also engaged in inappropriate conduct by sending an offensive email to her
supervisor," Defendant Wohlars.  Declaration of Georgia Colquhoun-Pryce ¶ 5, Dkt. 37.  Plaintiff does not dispute
those facts. *See, e.g.*, Pl. 56.1 ¶ 32 (admitting that Plaintiff "raised her voice at Dries because Dries had asked
Matias to look at her when Dries was speaking"); *id.* ¶¶ 26–28 (admitting that she received warnings due to
excessive lateness and never provided a doctor's note); *see also id.* ¶ 23 (admitting that she received a warning for
giving "an unnecessary electric shock to a conscious patient"); *id.* ¶ 29 (failing to rebut or deny that Wohlars
received "complaints from a number of Matias' co-workers" that Plaintiff "was loud, judgmental, and tried to blame
others for her mistakes"); Defs. Mem. of Law at 22–24 (recounting Plaintiff's punctuality and absenteeism issues
and documented inappropriate conduct).

create an abusive working environment." *Littlejohn*, 795 F.3d at 320–21 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). "This standard has both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014); *see also Duch v. Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009) (same); *Feingold v. New York*, 366 F.3d 138, 150 (2d Cir. 2004) (same).

"A work environment is 'abusive' when harassment has reached a certain qualitative level that is 'sufficiently severe or pervasive [so as] to alter the conditions of the victim's employment.'" *Raniola v. Bratton*, 243 F.3d 610, 617 (2d Cir. 2001) (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)). "On a motion for summary judgment, the question for the court is whether a reasonable factfinder could conclude, considering all the circumstances, that 'the harassment is of such a quality or quantity that a reasonable employee would find the conditions of her employment *altered for the worse*.'" *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 600 (2d Cir. 2006) (emphasis in original) (citation omitted). In making this determination, the court, assessing the totality of the circumstances, examines "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Cristofaro v. Lake Shore Cent. Sch. Dist.*, 473 F. App'x 28, 30 (2d Cir. 2012) (summary order) (citation omitted); *see also Harris*, 510 U.S. at 23; *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 150 (2d Cir. 1997) (the focus of the inquiry is "the nature of the environment itself").

"The incidents complained of 'must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" *Raspardo*, 770 F.3d at 114 (quoting *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002)).  Thus, while a single incident can suffice to substantiate a hostile work environment claim, such an incident, to qualify, must be "extraordinarily severe." *Desardouin v. City of Rochester*, 708 F.3d 102, 105 (2d Cir. 2013); *Paul v. Postgrad. Ctr. for Mental Health*, 97 F. Supp. 3d 141, 172 (E.D.N.Y. 2015); *see also Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 271 (2001) ("simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment'") (citation omitted).  Furthermore, Plaintiff "must demonstrate that the conduct occurred because of [her] protected status" — here, Plaintiff's religion — and that "a specific basis exists for imputing the conduct that created the hostile environment" to Defendants. *See Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 102 (2d Cir. 2020) (internal quotations and citation omitted).

The standard under the NYCHRL is more lenient: Plaintiff need only show that she was treated less well than other employees based on a protected characteristic. *Alvarado v. Nordstrom, Inc.*, 685 F. App'x 4, 8 (2d Cir. 2017) (summary order) (citing *Mihalik*, 715 F.3d at 110); *see also Syeed v. Bloomberg L.P.*, 2021 WL 4952486, at *17 (S.D.N.Y. Oct. 25, 2021) ("[A]t a minimum, a plaintiff must 'plead facts tending to show that actions that created the hostile work environment were taken against [her] *because of* a prohibited factor.'") (emphasis in original) (citation omitted).  Under the NYCHRL, an "employer may prevail on summary judgment if it shows that a reasonable jury could conclude only that the conduct amounted to no more than a petty slight.  Thus, courts may still dismiss 'truly insubstantial cases[]' where the defense is clear as a matter of law." *Mihalik*, 715 F.3d at 111 (citation omitted).

Defendants argue that Plaintiff has not identified any sufficiently severe or pervasive statements or conduct that would constitute a hostile work environment.  Defs. Mem. of Law at 20.  Although Plaintiff claims that "she was harassed because of her moral and conservative values as a Catholic," Defendants argue that she "does not allege that any anti-Catholic statements were made to her."  *Id.*  Likewise, Defendants argue that Wohlars's criticism of Plaintiff's religious speech at work amounts to criticism of her job performance and does not provide the basis for a hostile work environment claim.  *Id.* at 21.

Plaintiff, on the other hand, argues that Defendants failed to prevent Dries from "repeatedly harassing her by yelling at her in front of other patients, following her in a harassing fashion, sending her to non-functioning rooms to gather equipment, pulling her out of breakfast or lunch to do meaningless tasks, waving her finger at Plaintiff in a menacing gesture, and subjecting Plaintiff to discriminatory comments including 'is this about the Pope?'" creating a triable issue of fact whether she was subjected to a hostile work environment.  Pl. Opp. at 25. Further, Plaintiff claims Defendants exhibited religious animus because Plaintiff "was barred from speaking about her religion while other nurses were not barred from speaking about their respective religious beliefs," *id.* at 15, and because Wohlars "told Plaintiff on three separate occasions not to discuss her religion at the workplace" and to "find another job," *id.* at 16.

Plaintiff has failed to demonstrate a prima facie case of a hostile work environment based on her religious beliefs.  First, Plaintiff has not offered any evidence to show that Dries's purported "harassment" of Plaintiff was motivated by hostility towards Plaintiff's religion.  *See Garvin v. Potter,* 367 F. Supp. 2d 548, 567 (S.D.N.Y. 2005) (Plaintiff "provided no evidence linking the remarks to animosity toward the plaintiff because of [her] religion").  Plaintiff's skirmishes with Dries, "troubling though they may be," are nothing more than "run-of-the-mill

workplace conflicts" that simply "do not rise to the level of an objectively hostile workplace."

*Harvin v. Manhattan & Bronx Surface Transit Operating Auth.*, 767 F. App'x 123, 128 (2d Cir.

2019).  Even if those skirmishes added up to something more than standard workplace disputes,

Plaintiff has adduced no evidence that her contretemps with Dries were because of Plaintiff's

religion.

Second, even if the few, isolated comments directed at Plaintiff could be construed as

animus based on Plaintiff's religion, they are insufficiently pervasive to evidence a hostile work

environment.  *See Manessis v. N.Y.C. Dep't of Transp.*, 2003 WL 289969, at *6 (S.D.N.Y. Feb.

10, 2003), *aff'd sub nom. Manessis v. Chasin*, 86 F. App'x 464 (2d Cir. 2004) ("Single incidents,

unless very serious, generally do not satisfy the necessary requirement of severity or

pervasiveness.").  Admonishing Plaintiff for discussing religion in the workplace — specifically,

for making comments that could arguably be construed as implicating a co-worker's protected

status[23] — is not the kind of severe, pervasive conduct that Title VII or the NYSHRL proscribe.

*See, e.g.*, *Kearse* v. *ATC Healthcare Servs.*, 2014 WL 958738, at *8 (S.D.N.Y. Mar. 11, 2014)

(no finding of hostile work environment where plaintiff alleged, *inter alia*, that his supervisor

"stated harsh things" about his work performance).  In any event, Plaintiff cites to only two

instances of comments about her religion (Dries's question whether Plaintiff's refusal to donate

to a gay co-worker's wedding gift had to do with the Pope, and the directive from Wohlars that

Plaintiff refrain from speaking about religion altogether); while these remarks may have created

a tense and unpleasant atmosphere in which to work, they are simply "not severe or pervasive

---

[23]     According to Wohlars, when asked to contribute to a co-worker's wedding present, Plaintiff "went on a loud and offensive diatribe stating that Jesus was not going to forgive the co-worker [and] that gay marriage was not natural and an offense to the Catholic Church."  Wohlars Decl. ¶ 21.  Plaintiff's email to Wohlars that followed the incident reflects a similar sentiment.  *See id.* ¶ 22; Ex. H, Dkt. 36-8.

enough to be actionable." *Urban v. Cap. Fitness*, 2010 WL 4878987, at *9 (E.D.N.Y. Nov. 23,

2010) ("[A] 'hostile' work environment is not synonymous with an unpleasant, harsh, combative

or difficult work environment." (citation omitted)).

Put simply, Plaintiff has failed to marshal evidence that even remotely suggests that

Dries, or anyone else for that matter, created an abusive working environment because of

Plaintiff's religion or beliefs.  Plaintiff's remaining conclusory allegations of religious

discrimination amount to nothing more than conclusory, self-serving speculation attributing anti-

Catholic motives to regular workplace conflicts without any record evidence or corroboration.[24]

*See Kulak v. City of New York*, 88 F.3d 63,71 (2d Cir. 1996) ("[C]onclusory statements,

conjecture, or speculation by the party resisting the motion will not defeat summary judgment."

(citations omitted)).

Even under the less stringent standard of the NYCHRL, Defendants are entitled to

summary judgment on Plaintiff's hostile work environment claim.  Although she need not

demonstrate severe and pervasive conduct, Plaintiff must nonetheless "show that [s]he was

subjected to 'unequal treatment' based upon membership in a protected class."  *Livingston v.

City of New York*, 563 F. Supp. 3d 201, 255 (S.D.N.Y. 2021) (quoting *Fattoruso v. Hilton Grand

Vacations Co.*, 873 F. Supp. 2d 569, 578 (S.D.N.Y. 2012)).  Even assuming Plaintiff's non-

Catholic cohorts were granted preferential treatment as she claims, Plaintiff has nonetheless

failed to connect any of the alleged "unequal treatment" to her religious beliefs, much less create

a triable issue of fact as to whether Defendants' behavior was motivated by discriminatory

---

[24]     Plaintiff's remaining allegations include that she was "subjected to disparate treatment" because
purportedly non-Catholic co-workers "were not barred from speaking about their respective religious beliefs" and
their tardiness did not result in discipline.  Pl. Opp. at 15; Pl. 56.1 ¶ 65.  The first allegation includes no specifics as
to which co-worker was permitted to speak about religion, how Plaintiff knows that person's religion, who permitted
that person to speak about religion, when he or she was permitted to speak about religion and under what
circumstances, or how Plaintiff came to learn any of that.   The allegations regarding tardiness are similarly
conclusory.

animus.  *See Dressler v. N.Y.C. Dep't of Educ.*, 2012 WL 1038600, at *15 (S.D.N.Y. Mar. 29,

2012) (granting summary judgment as to Plaintiff's NYCHRL hostile work environment claim

because "[p]laintiff fails to adduce any evidence of discriminatory intent in the unpleasant

conduct alleged"); *see also Ferraro v. N.Y.C. Dep't of Educ.*, 404 F. Supp. 3d 691, 720

(E.D.N.Y. 2017) (dismissing NYCHRL hostile work environment claim, finding that even if

plaintiff's claims that defendants "threatened" him, issued "false" reports and observations, and

gave him feedback in a "critical fashion" were supported by the record, "there is no support in

the record that [p]laintiff was treated worse than other teachers" because of a protected

characteristic).  Although indicative of an unpleasant work environment, Plaintiff's scuffles with

Dries and Wohlars are insufficient to establish mistreatment that is "worse than 'petty slights and

trivial inconveniences.'"  *See Adams v. City of New York*, 837 F. Supp. 2d 108, 128 (E.D.N.Y.

2011) (citation omitted).

Put simply, Plaintiff has failed to point to any admissible evidence in the record that

shows Defendants engaged in or tolerated severe and pervasive conduct based on Plaintiff's

religion necessary to establish a prima facie hostile work environment claim under federal, state,

or city law.  Accordingly, Defendants are entitled to summary judgment on Plaintiff's hostile

work environment claims.

## III.    Plaintiff's FMLA Claims

Plaintiff's remaining claims rest on interference with and retaliation for Plaintiff's

medical leave request.  Plaintiff claims that Defendants interfered with her rights under the

FMLA by "refusing to allow Plaintiff to take her requested FMLA leave and requiring Plaintiff

to continuously update and renew her medical certification," and that Defendants "retaliated

against Plaintiff for requesting and taking FMLA leave" by terminating her employment.  *See*
Compl. ¶¶ 88–100; Pl. Opp. at 20.

### A.     FMLA Interference

To establish FMLA interference, a plaintiff must show: "1) that she is an eligible
employee under the FMLA; 2) that the defendant is an employer as defined by the FMLA; 3)
that she was entitled to take leave under the FMLA; 4) that she gave notice to the defendant of
her intention to take leave; and 5) that she was denied benefits to which she was entitled under
the FMLA."  *Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 424 (2d Cir. 2016); *Ziccarelli v.
NYU Hosps. Ctr.*, 247 F. Supp. 3d 438, 447 (S.D.N.Y. 2017).  Defendants only dispute the last
element, that Plaintiff was denied FMLA benefits to which she was entitled.

Defendants argue that Plaintiff was not denied leave benefits because Wohlars assisted
Plaintiff in submitting her FMLA request on July 10, 2018, and confirmed with the leave
department on July 24, 2018 that Plaintiff's paperwork had been fully submitted.  *See* Defs.
Mem. of Law at 15.  Although Plaintiff's initial request for FMLA leave occurred in May 2018,
"at that time, Matias did not provide a specific period of time that she anticipated that she would
be away from work as required" by Montefiore policy.  *Id.*; *see also* Pl. 56.1 ¶ 45.  Plaintiff
argues, however, that there is "at least a question for a trier of fact" whether Plaintiff's May 2018
leave request was within 30 days of the beginning of her anticipated leave.  Pl. Opp. at 18–19.

Plaintiff has not established a prima facie case of FMLA interference.  Plaintiff fails to
point to any record evidence to establish a genuine issue of fact that she requested FMLA leave
in May 2018 in accordance with Montefiore's leave policy.  *See* Pl. 56.1 ¶ 45; Pl. Dep. Tr.
155:2–158:6.  To the contrary, the record shows that Wohlars was responsive to Plaintiff's leave
request in July and submitted her written leave request on July 10, 2018; days later, Montefiore's
leave department contacted Plaintiff directly to complete her FMLA paperwork.  *See* Pl. 56.1

¶¶ 47–50, 53, 55; Pl. Dep. Tr. 162:3–163:25.  Even if Plaintiff's actions in May 2018 constituted

a leave request, and even if Defendants delayed processing that leave request, Plaintiff has not

presented evidence that she was denied benefits to which she was entitled under the FMLA.  It is

undisputed that on July 26, 2018, Plaintiff was terminated for legitimate reasons, which occurred

before her requested FMLA leave was scheduled to begin.  *See supra* at 22 n.22; Defs. Mem. of

Law at 15; Pl. 56.1 ¶ 56.  Thus, the purported delay in processing the May request had no impact

on Plaintiff.  *See Pearson v. Unification Theological Seminary*, 785 F. Supp. 2d 141, 162

(S.D.N.Y. 2011) ("[I]t is well-settled that an employer is not liable for 'interfering' with an

employee's leave when the employee would have been terminated regardless of the leave."); *see

also Hockenjos v. Metro. Transp. Auth.*, 2016 WL 2903269, at *6–9 (S.D.N.Y. May 18, 2016)

(excessive absenteeism and poor performance that predated FMLA leave established legitimate

reasons for plaintiff's termination), *aff'd sub nom. Hockenjos v. MTA Metro-North R.R.,* 695 F.

App'x 15 (2d Cir. 2017).  Accordingly, Defendants are entitled to summary judgment on

Plaintiff's FMLA interference claim.

### B.     FMLA Retaliation

A retaliation claim under the FMLA arises "where the employer intentionally seeks to

punish the employee for exercising FMLA rights."  *Colombo v. E. Irondequoit Cent. Sch.*, 2010

WL 6004378, *13 (W.D.N.Y. Dec. 10, 2010) (citing *Potenza v. City of New York*, 365 F.3d 165,

168 (2d Cir. 2004)).  To demonstrate a *prima facie* case of retaliation under the FMLA, Plaintiff

must establish that: (1) she exercised rights protected under the FMLA; (2) she was qualified for

her position; (3) she suffered an adverse employment action; and (4) the adverse employment

action occurred under circumstances giving rise to an inference of retaliatory intent.  *Dass v. City

Univ. of N.Y.*, 2020 WL 1922689, at *9 (S.D.N.Y. 2020).  Retaliatory intent for FMLA

retaliation "can be established indirectly by showing that the protected activity was closely

followed in time by the adverse action." *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996) (citation omitted).

Plaintiff's FMLA retaliation claim rests on the fact that Defendants terminated Plaintiff two weeks after Plaintiff submitted her July 9, 2018 FMLA request, and "approximately two months" after Plaintiff's May 2018 FMLA request, which, Plaintiff claims, is "sufficient temporal proximity from which retaliatory intent can be inferred." Pl. Opp. at 20 (citing *DeSio v. Singh*, 2021 WL 4449314 (S.D.N.Y. Sept. 28, 2021)). Because the record does not reflect the precise date on which Wohlars requested permission to terminate Plaintiff,[25] the temporal proximity of the request and the termination is sufficient to allow the Court to infer retaliatory intent for purposes of Plaintiff's prima facie case. *DeSio*, 2021 WL 4449314, at *15 (causal connection for purposes of FMLA retaliation can be established by "showing that the protected activity was closely followed in time by the adverse employment action"). In short, Plaintiff has demonstrated a prima facie case of FMLA retaliation, thus shifting the burden to Defendants to prove a legitimate, non-retaliatory reason for her discharge.

It is undisputed that Defendants made the decision to terminate Plaintiff after Plaintiff's June 28, 2018 insubordinate email to Wohlars, an incident that punctuated a history of unexcused lateness and numerous complaints from co-workers and patients about Plaintiff's behavior. *See* Defs. Mem. of Law at 16–17; Defs. Reply at 6; Pl. 56.1 ¶¶ 57–60. Plaintiff does not deny that she was disciplined for improper conduct, *see, e.g.*, Pl. 56.1 ¶¶ 31–32 (admitting that she "raised her voice at Dries" on June 28, 2018 after Dries "asked Matias about the medication that she had

---

[25]     The date on which Wohlars initiated the request to terminate Plaintiff is not in the record. *See supra* at 6 n.12. Ms. Colquhaoun-Pryce, an employee in Montefiore's Employee Relations department, stated that Wohlars made the request in early July. Colquhoun-Pryce Decl. ¶ 5, Dkt. 37. Thus, the Court can infer that the request was made after the May discussion of FMLA leave (particularly because one ground for Wohlars seeking to fire Plaintiff was her insubordinate email dated June 28, 2018) but before Plaintiff's formal FMLA leave request on July 10, 2018, which is the day human resources approved the termination request. *See id.*

given to a patient"), nor does she dispute that "Wohlars received complaints from a number of Matias' co-workers" about her conduct at work, *see* Pl. 56.1 ¶ 29.  Plaintiff further admits that she was frequently late.  *See* Pl. 56.1 ¶¶ 25–28.  The undisputed record reveals that Plaintiff's persistent tardiness reached the level at which, under Montefiore's progressive disciplinary policy, termination was the appropriate discipline.  Colquhoun-Pryce Decl. ¶ 5, Dkt. 37.  In short, notwithstanding the fact that the decision to terminate her came shortly on the heels of Plaintiff's requests for FMLA leave, the undisputed evidence shows that the termination decision was legitimate and non-retaliatory.

Under the *McDonnell-Douglas* framework, the burden then shifts back to the Plaintiff to offer evidence that Defendants' reasons for her termination were pretextual.  Because Plaintiff has offered no evidence of pretext, she has not created a question of fact on her FMLA retaliation claim.

Accordingly, Defendants' motion for summary judgment on Plaintiff's FMLA interference and retaliation claims is granted.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED. The Clerk of Court is respectfully directed to close the open motion at Dkt. 33 and to close this case.

**SO ORDERED.**

**Date:  September 23, 2022**
**New York, New York**

**VALERIE CAPRONI**
**United States District Judge**